NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____ )
                                            )
                                            )        Hon. Garrett E. Brown, Jr.
IN RE: NEW JERSEY TITLE INSURANCE           )
LITIGATION                                  )        Consolidated Civil Action 08-1425
                                            )
                                            )        **MEMORANDUM OPINION**
_____ )

**BROWN**, Chief Judge:

     This consolidated matter comes before the Court on Defendants' joint motion (Doc. No. 153) to dismiss Plaintiffs' Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  For the following reasons, the Court will grant Defendants' joint motion.

## I.      BACKGROUND

     Plaintiffs are title insurance purchasers who represent a putative class of similarly situated consumers that claim they suffered injuries, in the form of inflated insurance rates, because of the unlawful price-fixing conspiracy of various insurance-provider Defendants who are members of the New Jersey Land Title Insurance Rating Bureau (NJLTIRB).  The NJLTIRB functions as a title insurance rating organization pursuant to N.J. Stat. Ann. § 17:46B-46, which means that it operates, more or less, as a clearing house for its constituent members by collecting their proposed rates and supporting data and submitting them to the New Jersey Department of Banking and Insurance (DOBI), which regulates insurance rates.

     By Orders of August 5, 2008 and November 18, 2008 (Doc. No. 45; Civ. No. 08-5037,

Doc. No. 7), Magistrate Judge Salas consolidated 10 separate actions alleging substantially the same antitrust violations.  On September 19, 2008, Consolidated Plaintiffs filed an Amended Complaint alleging violations of the Sherman Act and the New Jersey Antitrust Act.  Defendants filed their first joint motion to dismiss on October 29, 2008.  This matter was reassigned to the undersigned on September 9, 2009, and the Court granted Defendants' motion to dismiss without prejudice on October 5, 2009.  *In re New Jersey Title Ins. Litig.* ("*New Jersey Title Insurance I*"), No. 08-1425, 2009 WL 3233529 (D.N.J. Oct. 5, 2009).

In granting Defendants' motion, the Court first assessed the dual purposes at the heart of the filed rate doctrine—the nonjusticiability and nondiscrimination principles.[1]  *Id.* at *2.  The Court then considered the title insurance regulatory system established by New Jersey law, which: (1) vests the DOBI with regulatory authority over title insurance rates; (2) requires title insurance providers to submit proposed rates to the Commissioner of the DOBI for approval; and (3) permits title insurance providers to satisfy their rate-filing requirements by joining a licensed title insurance organization.  *Id.* at *3 (citing N.J. Stat. Ann. §§ 17:1C-19(a)(1), 17:46B-42(a), 17:46B-42(b), 17:46B-45(a)).  Lastly, the Court addressed the pleadings, noting that it was undisputed that Defendants had filed their proposed rates with the DOBI through the NJLTIRB, a licensed title insurance rating organization pursuant to N.J. Stat. Ann. § 17:46B-46, and that Plaintiffs had not alleged that Defendants charged title insurance rates without the approval of

---

[1]The nonjusticiability principle reflects courts' general reluctance to second-guess the final rate decisions of a regulatory agency vested by law with the authority to make such determinations.  *See, e.g.*, *AT&T Corp. v. JMC Telecom, LLC*, 470 F.3d 525, 535 (3d Cir. 2006); *Wegoland v. NYNEX Corp.*, 27 F.3d 17, 21 (2d Cir. 1994).  The nondiscrimination principle reflects the judiciary's inability to remedy a consumer's rate-based injury without discriminating against other customers that would continue to pay the original rates.  *Wegoland*, 27 F.3d at 19 (citing *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156, 163–64 (1922)).

the Commissioner of the DOBI. *Id.* These circumstances prompted the Court to conclude that the filed rate doctrine barred Plaintiffs' antitrust claims. *Id.* at *2–3. The Court further found that the filed rate doctrine barred "Plaintiffs' broadly conceived request for injunctive relief" because Plaintiffs' requested relief would have "usurp[ed] the authority of the DOBI that has already approved Defendants' rates." *Id.* at *4.

The Court granted Plaintiffs leave to file a Second Amended Complaint (SAC), which Plaintiffs did on November 4, 2009. The SAC asserts violations of the Sherman Act and the New Jersey Antitrust Act and seeks injunctive relief pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26. In response to the Court's October 5, 2009 decision, Plaintiffs have narrowed their claims to seek only injunctive relief targeting Defendants' future collective-rate filings. (SAC, Prayer for Relief ¶ (f) (seeking to enjoin Defendants from "from engaging in collective rate setting with regard to all future title insurance rate filings with DOBI").) The Court notes that the SAC expressly preserves Plaintiffs' previously dismissed claims for purposes of appeal.

Defendants now move to dismiss, arguing: (1) that *Burford* abstention requires dismissal; (2) that Plaintiffs have not pleaded sufficient facts to establish standing to seek injunctive relief; (3) that Plaintiffs' Sherman Act claim is barred by the McCarran-Ferguson Act's exemption provision, 15 U.S.C. § 1012(b); (4) that the state action doctrine bars Plaintiffs' Sherman Act claim; (5) that Plaintiffs' proposed injunction would usurp the authority of the New Jersey legislature and the DOBI to regulate New Jersey's rate-setting system; and (6) that N.J. Stat. Ann. § 56:9-5(b)(4) forecloses Plaintiffs' claim under the New Jersey Antitrust Act because the NJLTIRB's collective rate-setting practices were subject to the regulation of the Commissioner of the DOBI.

3

## II.     ANALYSIS

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A complaint will survive a motion to dismiss if it contains sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  The plausibility standard requires that "the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" and demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).   In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Defendants presently challenge Plaintiffs' antitrust claims on the basis of standing, *Burford* abstention, the McCarran-Ferguson Act's exemption provision, the state action doctrine, and N.J. Stat. Ann. § 56:9-5(b)(4).  The Court addresses each argument in turn.  This Court has

federal question jurisdiction over Plaintiffs' Sherman Act claim pursuant to 28 U.S.C. § 1331, and the Court will exercise supplemental jurisdiction over Plaintiffs' New Jersey Antitrust Act claim pursuant to 28 U.S.C. § 1367 because this claim and the Sherman Act claim derive from a "common nucleus of operative fact," and the claims are such that they would normally "be expected to be tried in one judicial proceeding." *MCI Telecomms. Corp v. Teleconcepts, Inc.*, 71 F.3d 1086, 1102 (3d Cir. 1995).

    *A. Burford Abstention*

    Before addressing Defendants' challenges to the merits of Plaintiffs' claims, the Court considers Defendants' argument that this Court should decline jurisdiction pursuant to the abstention doctrine pronounced in *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). Pursuant to the *Burford* doctrine, "[w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are 'difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar'; or (2) where the 'exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.'" *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 361 (1989) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976)).

    Here, Plaintiffs allege that Defendants, title insurance providers, have violated federal and state antitrust laws by using New Jersey's collective rate-filing system to inflate title insurance rates. Defendants' reliance on *Burford* is misplaced because neither of Plaintiffs' claims

challenges a decision of a state agency.  "Cases implicating *Burford* abstention involve state orders against an individual party that a federal-court plaintiff seeks to enjoin."  *Keeley v. Loomis Fargo & Co.*, 183 F.3d 257, 273 n.13 (3d Cir. 1999) (finding *Burford* abstention "clearly inappropriate" where Plaintiffs, trucking industry employees, challenged the validity of a generally applicable overtime pay regulation, and "not a specific administrative order aimed at one party"); *see also Polak v. Kobayashi*, No. Civ.A. 05-330, 2005 WL 2008306, at *3 (D. Del. Aug. 22, 2005) (finding *Burford* abstention inappropriate because the dispute did not involve a specific administrative order's effects on particular party); *Synagro-WWT, Inc. v. Rush Twp., Penn.*, 204 F. Supp. 2d 827, 833 (M.D. Pa. 2002) (same); *Peco Energy Co. v. Twp. of Haverford*, No. 99-4766, 1999 WL 1240941, at *5 (E.D. Pa. Dec. 20, 1999) (same).   The fact that Plaintiffs assert federal rights under the Sherman Act also counsels against abstention.  *See Lac D'Amiante du Quebec, LTEE v. Am. Home Assurance Co.*, 864 F.2d 1033, 1044 (3d Cir. 1988).  Because Plaintiffs assert federal rights, and because the present dispute does not concern the effects of a specific DOBI ruling on these Plaintiffs, the Court finds that *Burford* abstention is not warranted in this case.

   *B.  Standing*

   Defendants next argue that Plaintiffs do not have standing to pursue their antitrust claims because Plaintiffs have not alleged an existing or impending antitrust injury.  Defendants' argument is both constitutional and statutory in nature in that it challenges Plaintiffs' standing to bring these claims under both Article III of the Constitution and section 16 of the Clayton Act. The Court agrees with Defendants that Plaintiffs have not alleged a real or immediate antitrust injury and, thus, do not have standing to seek injunctive relief.

6

"Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.'" *Allen v. Wright*, 468 U.S. 737, 750 (1984).  Courts have construed this limitation on federal judicial power to require that federal court plaintiffs have standing to invoke the remedial powers of federal courts.  "In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III.  This is the threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  By requiring the federal court plaintiff to have "a personal stake in the outcome of the controversy," the standing doctrine "assure[s] that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

The constitutional "core" of standing requires that "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen*, 468 U.S. at 751.  With regard to injury, the standing doctrine requires that the plaintiff allege an "injury in fact" that is either "(a) concrete and particularized" or "(b) actual or imminent," but "not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted).  "[I]n order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both 'real and immediate . . . .'" *In re New Motor Vehicles Canadian Export Antitrust Litig.*, 522 F.3d 6, 14 (1st Cir. 2008) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).  The causation element of standing ensures that the correct parties are before the court.  "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if

unaccompanied by any continuing, present adverse effects." *O'Shea*, 414 U.S. at 496. "[T]he injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (internal quotation marks and citation omitted). Lastly, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotation marks and citation omitted).

Within the contours of the constitutional standing requirements, section 16 of the Clayton Act requires a plaintiff to allege "threatened loss or damage" stemming from an antitrust violation in order to seek injunctive relief. 15 U.S.C. § 26.[2] The Supreme Court has construed section 16's "threatened loss or damage" provision to require a plaintiff to "demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 130 (1969); *see also Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247 (3d Cir. 2010). In this regard, section 16's standing framework "dovetails with Article III's requirement that in order to obtain forward-looking relief, a plaintiff must face a threat of injury that is both real and immediate, not conjectural or hypothetical." *In re New*

---

[2]Section 16 of the Clayton Act provides in pertinent part:

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon . . . a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue[.]

15 U.S.C. § 26.

*Motor Vehicles*, 522 F.3d at 14 (quoting *O'Shea*, 414 U.S. at 494) (internal quotation marks

omitted).  A plaintiff must also allege that the threatened loss or damage proximately results from

the antitrust violation.  *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 856 (3d Cir. 1996).

Here, Plaintiffs argue they have alleged both an existing and future injury justifying

injunctive relief under the Clayton Act, consisting of the current inflated prices that have resulted

from Defendants' collective rate-setting practices, and the future inflated prices that would result

from continued collective rate-setting.  (Pls.' Br. at 19; *see* SAC ¶¶ 55–56.)  With regard to

Plaintiffs' asserted existing injury, the Court has already ruled that Plaintiffs' claims attacking the

existing rates, which have been approved by the Commissioner of the DOBI, are barred by the

filed rate doctrine.  *New Jersey Title Insurance I*, 2009 WL 3233529, at *4.  Courts have

recognized that the payment of rates shielded by the filed rate doctrine does not constitute a legal

injury.  *See, e.g.*, *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156, 163 (1922) (explaining that a

filed rate does not constitute an injury under the Anti-Trust Act because, "[u]nless and until

suspended or set aside, this rate is made, for all purposes, the legal rate"); *Wegoland Ltd. v.

NYNEX Corp.*, 27 F.3d 17, 18 (2d Cir. 1994) ("Simply stated, the doctrine holds that any 'filed

rate'—that is, one approved by the governing regulatory agency—is per se reasonable and

unassailable in judicial proceedings brought by ratepayers."); *Williams v. Duke Energy Int'l, Inc.*,

606 F. Supp. 2d 783, 789 (S.D. Ohio 2009) (construing *Keogh* to stand for the proposition that "a

plaintiff could suffer no cognizable legal injury under the antitrust laws by being charged the

filed rate" that had been approved by the administrative agency vested with rate-setting authority

by law).  It follows, then, that if the existing rates do not constitute a cognizable legal injury for

purposes of an antitrust claim seeking the retrospective relief of damages, the same rates cannot

confer standing to seek prospective injunctive relief from future collective rate filings, because there would be no "continuing, present adverse effects" from the existing rates.  *See O'Shea*, 414 U.S. at 496.

With regard to Plaintiffs' purported future injury related to Defendants' future collective rate-setting practices, the Court finds Plaintiffs' forecast too speculative to constitute the actual injury or significant threat of injury required by Article III and section 16 of the Clayton Act.  As Defendants correctly note, Plaintiffs have not alleged that Defendants, members of the NJLTIRB, have collectively filed new proposed insurance rates with the DOBI, or that Defendants intend to do so in the near future.  Nor have Plaintiffs alleged that they intend to purchase new title insurance policies in the immediate future.  Plaintiffs' theory of future injury also depends upon the presumption that the DOBI will continue, as Plaintiffs allege, to fail to properly supervise the collective rate-filing system.

Plaintiffs respond by pointing to New Jersey's statutory requirement that title insurers submit proposed rates to the Commissioner of the DOBI, *see* N.J. Stat. Ann. § 17:46B-42, and a study that suggests that homeowners typically own their homes for seven years.  Yet, neither of these sources suggests a significant threat of injury that is real and immediate.  Presuming Plaintiffs' allegations to be true, the Court has no indication when the NJLTIRB will file the next batch of proposed title insurance rates for Defendants, and presuming that these Plaintiffs will follow the homeowning trends reported in the study on which Plaintiffs rely,[3] it may be years before these Plaintiffs would pay a newly-approved title insurance rate.

---

[3]Although Plaintiffs did not provide an example of the study that they cite, the Court accepts Plaintiffs' characterization of the study for purposes of argument.

Plaintiffs further argue that *Delco, LLC v. Giant of Maryland, LLC*, a recent case from this District, and *Reilly v. Medianews Group, Inc.*, from the Northern District of California, support a finding of standing in this case.  Yet the plaintiffs in those cases were frequent consumers in a particular market, and they sought to enjoin imminent or pending transactions. *Delco*, No. 07-3522, 2007 WL 3307018, at *11–12 (D.N.J. Nov. 8, 2007) (finding, at the preliminary injunction stage, that a "regular" customer of a store that Defendants intended to close had standing to seek injunctive relief under section 16 of the Clayton Act to prevent Defendants from closing the store); *Reilly*, 2007 WL 1068202, at *1, 4–6 (N.D. Cal. Apr. 10, 2007) (concluding that an "active consumer in the Bay Area newspaper market" had standing under section 16 of the Clayton Act to seek injunctive relief to "block and undo a series of transactions" consolidating San Francisco's newspapers).  Viewing their allegations in the most favorable light, Plaintiffs in this case cannot be described as frequent customers, and the anticipated antitrust injury is entirely speculative.  Rather, the Court finds that Plaintiffs' purported future antitrust injury more closely resembles the "chain of dependant contingencies" that a court in the Southern District of New York found insufficient to confer standing under section 16 of the Clayton Act.  *See Am. Med. Ass'n v. United Healthcare Corp.*, No. 00-2800, 2007 WL 683974, at *6–7 (S.D.N.Y. Mar. 5, 2007) (finding purported antitrust injury too speculative because it presumed the following contingencies: (1) that counterclaim defendants would obtain critical data concerning counterclaim plaintiffs' rates; (2) that counterclaim defendants would disseminate this rate information to physicians nationwide; (3) that these physicians would use this information to adjust prices; and (4) that the adjusted prices would injure counterclaim plaintiffs).

Given the speculative nature of Plaintiffs' injury—which presumes future unlawful rate filings by the NJLTIRB on behalf of Defendants, the DOBI's continued inability to regulate title insurance rates, and the subsequent purchase of title insurance by these Plaintiffs at some point in the future—this Court agrees with Defendants that Plaintiffs have not alleged a real and immediate injury or a significant threat of injury from an impending antitrust violation. Therefore, the Court finds as a matter of law that Plaintiffs lack standing to seek injunctive relief.

C. *McCarran-Ferguson Act*

In addition to the standing deficiencies detailed above, the Court finds that the McCarran-Ferguson Act's exemption provision bars Plaintiffs' claims.  This Act provides in pertinent part:

> **Sec. 1012(a) State regulation**
> The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
>
> **(b) Federal regulation**
> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law.
>
> **Sec. 1013(b)**
> Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

15 U.S.C. §§ 1012–13.  Because Plaintiffs do not suggest that Defendants' conduct involved an

12

agreement to boycott, coerce, or intimidate, *see* 15 U.S.C. § 1013(b), the Court considers the application of § 1012(b) to Plaintiffs' claims.  Generally speaking, this section "creates a reverse-preemption doctrine for insurance legislation.  That is, a state statute that regulates insurance presumptively preempts a contrary Congressional statute unless the Congressional statute specifically relates to insurance." *Legal Asset Funding, LLC v. Travelers Cas. & Sur. Co.*, 155 F. Supp. 2d 90, 97 (D.N.J. 2001) (citations omitted).  However, "the language of the Act distinguishes preclusion analysis where [federal] antitrust laws are at issue." *Sabo v. Metro. Life Ins. Co.*, 137 F.3d 185, 189 n.1 (3d Cir. 1998) (citing *U.S. Dep't of the Treasury v. Fabe*, 508 U.S. 491, 504 (1993)).  The second clause of § 1012(b), which specifically refers to the Sherman Act and the Clayton Act, provides that these statutes "shall be applicable to the business of insurance to the extent that such business is not regulated by State Law."  15 U.S.C. § 1012(b). The Supreme Court has construed this provision narrowly, explaining that the protections of the McCarran-Ferguson Act extend only to the "business of insurance," and not the "business of insurance companies." *See Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 132 (1982); *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 211 (1979).

Because Plaintiffs' SAC presents a federal antitrust claim under the Sherman Act, the questions before the Court, for purposes of determining whether § 1012(b) permits Plaintiffs' claim, are: (1) whether title insurance constitutes the "business of insurance," and (2) whether title insurance is "regulated by state law." *Royal Drug*, 440 U.S. at 210 & n.4 (1979); *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129, 1133 (3d Cir. 1993).  This Court finds as a matter of law that Plaintiffs' Sherman Act claim is barred by § 1012(b) because title insurance constitutes the business of insurance and is regulated by New Jersey law.

13

*1. Business of Insurance*

The Supreme Court has identified three relevant criteria for determining whether a particular practice constitutes the "business of insurance" for purposes of § 1012(b)'s antitrust immunity: (1) does the practice "ha[ve] the effect of transferring or spreading a policyholder's risk"; (2) is the practice "an integral part of the policy relationship between the insurer and the insured"; and (3) is the practice "limited to entities within the insurance industry." *Pireno*, 458 U.S. at 129 (citing *Royal Drug*, 440 U.S. at 211–21). No one factor is determinative. *Id.*

Plaintiffs in this case argue that title insurance, and particularly Defendants' collective rate-setting practices, satisfies none of the *Pireno* factors. First, Plaintiffs argue that title insurance is really a limited warranty because it does not involve sufficient pooling or spreading of risk. According to Plaintiffs, "the average payout on a title insurance policy in New Jersey amounted to less than five percent of the total premiums collected." (SAC ¶ 38.) Indeed, "[t]he primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk." *Royal Drug*, 440 U.S. at 211. Yet, Plaintiffs concede in the SAC that title insurance policies do involve a risk component. (SAC ¶¶ 37–38.) Thus, Plaintiffs concede that title insurance bears the essential quality of an insurance policy—the insured's risk is passed to the insurer. *See, e.g.*, *Owens v. Aetna Life & Cas.*, 654 F.2d 218, 224 (3d Cir. 1981) ("The earmark of insurance is the underwriting and spreading of risks in exchange for a premium.").

But Plaintiffs contend that there is not enough risk-spreading for title insurance to qualify as the business of insurance. Plaintiffs cite the Supreme Court's decision in *SEC v. Variable Annuity Life Insurance Co. of America*, 359 U.S. 65 (1959), for the proposition that the McCarran-Ferguson Act does not protect insurance policies involving a minimal amount of risk.

14

Yet, Plaintiffs misstate *Variable Annuity*'s holding.  The *Variable Annuity* Court held that, for purposes of federal statutory exemptions, including the McCarran-Ferguson Act, "the concept of 'insurance' involves some investment risk-taking on the part of the company." 359 U.S. at 71. The variable annuities at issue in that case did not constitute insurance because they did not involve *any* risk-spreading.  *Id.* at 71–72 (explaining that "[t]here is no true underwriting of risks" because "the variable annuity places all the investment risks on the annuitant, none on the [policy provider]").

While the risk component may comprise only a small portion of title insurance rates, there is no dispute that the title insurer assumes *some* risk when it issues a policy: the risk of an undetected title defect.[4]  *See* N.J. Stat. Ann. § 17:46B-1(a) (defining "title insurance" to include "insuring, guaranteeing or indemnifying owners of real property or others interested therein against loss or damage suffered by reason of liens, encumbrances upon, defects in or the unmarketability of the title to said property"); *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 625 (1992) ("Title insurance is the business of insuring the record title of real property for persons with some interest in the estate, including owners, occupiers, and lenders.  A title insurance policy insures against certain losses or damages sustained by reason of a defect in title not shown on the policy or title report to which it refers.").[5]  *Variable Annuity* requires nothing more. Accordingly, the Court finds that title insurance satisfies the first *Pireno* factor.

_____

[4]No doubt, the risk of an undiscovered title defect is a substantial risk from the perspective of the policy holder.

[5]The Supreme Court has also described title insurance as a form of insurance in the context of federal tax law.  *United States v. Home Title Ins. Co.*, 285 U.S. 191, 195 (1932) (concluding a title insurance provider constituted an "insurance company" under the Internal Revenue Code).

15

With regard to the second and third *Pireno* factors, Plaintiffs argue that Defendants' rates are primarily comprised of commissions and kickbacks to the title insurance agents and brokers who determine which insurance provider a given customer will use.  Plaintiffs contend that these hidden costs, which arise from agreements between the insurer and third parties, have no bearing on the insurance relationship between the insurer and the insured.  Towards this end, Plaintiffs note that both the Third Circuit and Ninth Circuit have ruled that certain services provided by title insurers do not qualify as the business of insurance.  *See Ticor*, 998 F.2d at 1133–38 (concluding that the title search and examination provided by a title insurer did not constitute the business of insurance); *United States v. Title Ins. Rating Bureau of Ariz., Inc.*, 700 F.2d 1247, 1251–52 (9th Cir. 1983) (finding that escrow services did not constitute the business of insurance).  Yet neither of these cases addressed the rates paid for title insurance policies; this case does.  It is well-established that the setting of premium rates for insurance policies constitutes the business of insurance.  *See, e.g.*, *Royal Drug*, 440 U.S. at 224 n.32 ("It is clear from the legislative history [of the McCarran-Ferguson Act] that the fixing of rates is the 'business of insurance.'"); *Gilchrist v. State Farm Mut. Auto. Ins. Co.*, 390 F.3d 1327, 1331 (11th Cir. 2004) ("Rate-making, of course, is the paradigmatic example of the conduct that Congress intended to protect by the McCarran-Ferguson Act.").  The fact that insurers collectively set the policy rates through a ratings bureau does not remove the rate-setting practice from the business of insurance.  *Owens*, 654 F.2d at 225–26.

While Plaintiffs argue that they are only challenging the hidden costs derived from

16

Defendants' alleged side deals with agents and brokers,[6] their pleadings reveal otherwise.  The

SAC only names title insurers as Defendants (SAC ¶¶ 11–16),[7] and the prayer for relief seeks to

enjoin "Defendants from engaging in collective rate setting with regard to all future title

insurance rate filings with the [DOBI]" (*id.* Prayer for Relief ¶ (e)).  Thus, it cannot be gainsaid

that Plaintiffs' Sherman Act claim does not challenge the rate-making process for title insurance

policies.  The rate-making process directly impacts the policy relationship between the insurer

and the insured, and, as demonstrated by the SAC, the challenged practice only involves entities

within the insurance industry.  The Court is satisfied that the second and third *Pireno* factors

have been met.

A number of courts have recognized that title insurance constitutes the business of

insurance for purposes of the McCarran-Ferguson Act.  *See, e.g., Crawford v. Am. Title Ins. Co.*,

518 F.2d 217, 217 n.1, App. (5th Cir. 1975) (per curiam); *Commander Leasing Co. v.

Transamerica Title Ins. Co.*, 477 F.2d 77, 83 (10th Cir. 1973).  Most recently, in a case involving

similar claims alleging that the members of a title insurance ratings bureau in the State of Ohio

collectively fixed title insurance rates to mask hidden kickbacks to insurance agents, a court in

the Northern District of Ohio ruled that the plaintiffs' Sherman Act claim was barred by the

McCarran-Ferguson Act because the collective rate-filing process permitted by Ohio law

---

[6]Although the Supreme Court in *Royal Drug* did not decide whether commissions paid to insurance agents constitutes the business of insurance, *see* 440 U.S. at 224 n.32, the First Circuit recently concluded "that the 'business of insurance' covers . . . allegations concerning the effect on pricing that would occur if insurers did not use brokers and agents and kept any saved expenses." *Arroyo-Melecio v. P.R. Am. Ins. Co.*, 398 F.3d 56, 68 (1st Cir. 2005).

[7]The SAC also alleges that "various other persons, firms and corporations . . . have participated as co-conspirators," but the SAC only identifies "various title insurers, not named as defendants herein, who were members of the NJLTIRB" as co-conspirators.  (SAC ¶ 20.)

constituted the business of insurance.  *In re Title Ins. Antitrust Cases*, No. 08–677, 2010 U.S.

Dist. LEXIS 30913, at *93–94 (N.D. Ohio Mar. 31, 2010).  In doing so, the court rejected similar

arguments that title insurance was a "limited warranty" and that *Variable Annuity* imposed a

substantial risk requirement.  *See id.* at *87–92.  This Court joins the above courts in concluding

that collective rate-setting of title insurance rates constitutes the business of insurance.

### 2.  *Regulated by State Law*

Courts have recognized that the state regulation requirement of § 1012(b) is satisfied

when "a state has generally authorized or permitted certain standards of conduct" for insurance

companies.  *Ohio AFL-CIO v. Ins. Rating Bd.*, 451 F.2d 1178, 1181 (6th Cir. 1971); *accord*

*Seasongood v. K and K Ins. Agency*, 548 F.2d 729, 734 (8th Cir. 1977); *Commander Leasing*,

477 F.2d at 84.  Consequently, this Court's "present task is to determine only whether the [State]

has regulated the business of title insurance, and not to determine whether this regulation could

be better and more effectively done."  *See Commander Leasing*, 477 F.2d at 84.

As this Court explained in *New Jersey Title Insurance I*, 2009 WL 3233529, at *1–3,

New Jersey law provides a comprehensive regulatory scheme for the setting of title insurance

rates.  For starters, the DOBI "has a statutory obligation to protect the interests of New Jersey's

insurance consumers and to regulate and oversee the operations of the insurance industry."  N.J.

Stat. Ann. § 17:1C-19(a)(1).  New Jersey law requires title insurance providers to submit

proposed rates to the Commissioner of the DOBI for approval, but it permits title insurers to

satisfy the rate-filing requirement by joining a licensed title insurance rating organization and

collectively submitting proposed rates.  *Id.* § 17:46B-42(a)–(b).  Indeed, New Jersey's insurance

law expressly "authorize[s] cooperative action between or among title insurance companies in

rate making." *Id.* § 17:46B-41.  Furthermore, New Jersey law instructs the Commissioner to review proposed rates to ensure that they "are not unreasonably high, and are not inadequate for the safeness and soundness of the insurer, and are not unfairly discriminatory between risks in this State involving essentially the same hazards and expense elements." *Id.* § 17:46B-45(a); *see also id.* § 17:46B-41 (providing that title insurance rates "shall not be excessive, inadequate or unfairly discriminatory").

Plaintiffs argue that the DOBI does not actively supervise Defendants' collective rate-setting practices, and that the DOBI is incapable of addressing the hidden costs Plaintiffs allege Defendants have included in their rates.  "However, the McCarran Act exemption does not depend on the zeal and efficiency displayed by a state in enforcing its laws.  Congress has provided that exemption whenever there exists a state statute or regulation capable of being enforced." *Lawyers Title Co. of Mo. v. St. Paul Title Ins. Corp.*, 526 F.2d 795, 797 (8th Cir. 1975) (citation omitted).  "Once the existence of such regulatory authority has been ascertained, federal enforcement must yield to the state." *Id.* (concluding that title insurance pricing practices were exempt from federal antitrust laws under the McCarran-Ferguson Act because the practices were regulated by Missouri law).  New Jersey law provides the appropriate standards of conduct for the setting of title insurance rates.  The McCarran-Ferguson Act's exemption provision requires nothing more.  Therefore, the Court concludes that New Jersey law regulates Defendants' collective rate-setting practices.

### 3. Conclusion

For the aforementioned reasons, this Court concludes (1) that Defendants' collective rate-setting practices constitute the "business of insurance," and (2) that these practices are "regulated

by state law."  Accordingly, Plaintiffs' Sherman Act claim is barred by the McCarran-Ferguson

Act's exemption provision, 15 U.S.C. § 1012(b).

     D.  *New Jersey Antitrust Act Exemption*

     Finally, Defendants' argue that the New Jersey Antitrust Act specifically exempts

insurance activities from the Act's protections to the extent that those practices are subject to the

regulation of the Commissioner of the DOBI.  Indeed, N.J. Stat. Ann. § 56:9-5(b)(4) provides in

pertinent part that:

> No provisions of [the New Jersey Antitrust Act] shall be construed to make
> illegal:
>
> . . .
>
> (4) The activities, including, but not limited to, the making of or participating
> in joint underwriting or joint reinsurance arrangements, of any insurer,
> insurance agent, insurance broker, independent insurance adjuster or rating
> organization to the extent that such activities are subject to regulation by the
> Commissioner of Banking and Insurance of this State under, or are permitted,
> or are authorized by, the "Department of Banking and Insurance Act of
> 1948," P.L.1948, c. 88 (C.17:1-1.1 et al.) and the "Department of Insurance
> Act of 1970," P.L.1970, c. 12 (C.17:1C-1 et seq.), . . . .

Plaintiffs argue that this statutory exemption does not apply to their claim because Defendants'

activities do not constitute the "business of insurance," and because the DOBI does not properly

exercise its authority to regulate the setting of title insurance rates.  (Pls.' Br. at 9 n.3.)  Yet

Plaintiffs' argument unduly narrows the broad language of the exemption provision.  Pursuant to

N.J. Stat. Ann. § 56:9-5(b)(4), insurance activities need only be "subject to regulation by the

Commissioner of [DOBI]" under state insurance law to be exempt from the New Jersey Antitrust

Act.  This exemption provision "was designed to avoid the situation whereby a state regulatory

agency acting pursuant to one statute (the insurance laws) requires conduct which might be held

to violate another statute (the Anti-trust Act)." *Shapiro v. Middlesex County Mun. Joint Ins. Fund*, 307 N.J. Super. 453, 458 (App. Div. 1998) (citation and internal quotation marks omitted). New Jersey courts have adopted the McCarran-Ferguson Act's standard for "subject to regulation" in construing the breadth of this exemption provision. *See, e.g.*, *Chick's Auto Body v. State Farm Mut. Auto. Ins. Co.*, 168 N.J. Super. 68, 76 (Law Div. 1979).

As the Court explained above, the NJLTIRB, as a licensed title insurance rating organization, engages in a statutorily-authorized insurance activity when it submits proposed title insurance rates to the Commissioner of the DOBI on behalf of Defendants. There is no question that this insurance activity is subject to the regulation of the Commissioner of the DOBI, who must approve all proposed title insurance rates. N.J. Stat. Ann. §§ 17:46B-42(a) (requiring every title insurance provider to file its proposed rates with the Commissioner of the DOBI), 17:46B-45 (directing the Commissioner to review the proposed rates to ensure that they "provide for, result in, or produce rates that are not unreasonably high, and are not inadequate for the safeness and soundness of the insurer, and are not unfairly discriminatory between risks in this State involving essentially the same hazards and expense elements," and setting the procedure for the Commissioner's disapproval of proposed rates). Accordingly, Plaintiffs' New Jersey Antitrust Act claim is barred by N.J. Stat. Ann. § 56:9-5(b)(4).

## III.    CONCLUSION

For the aforementioned reasons, the Court will grant Defendants' joint motion (Doc. No. 153) to dismiss Plaintiffs' Second Amended Complaint (Doc. No. 149). Because the Court concludes as a matter of law that the McCarran-Ferguson Act and N.J. Stat. Ann. § 56:9-5(b)(4) bar Plaintiffs' federal and state antitrust claims, subsequent amendment would be futile. Thus,

21

the Court will dismiss Plaintiffs' antitrust claims with prejudice.  Congress has chosen to exempt

states' regulation of the insurance industry from federal antitrust laws, and New Jersey's

legislature has followed suit with regard to state antitrust laws.  New Jersey has enacted a

comprehensive regulatory regime for approving title insurance rates.  Accordingly, Plaintiffs'

complaint with the functioning of this system is appropriately addressed either to Congress, the

New Jersey legislature, or the DOBI.  An appropriate form of order accompanies this

Memorandum Opinion.


Dated: July 6, 2010

                                                /s/ Garrett E. Brown, Jr.
                                                GARRETT E. BROWN, JR., U.S.D.J.


22